UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

Case No. 15-cr-20709

Plaintiff,

Hon. Linda V. Parker
United States District Judge

v.

RAYMEL GREENE,

Defendant.

---

## United States' Response Opposing
## the Defendant's Motion for Compassionate Release

---

Greene is a career offender, who this Court sentenced to 120 months in prison for his third drug trafficking conviction. In his preceding state-court conviction for distributing cocaine, he provided cocaine to a user who then died from an overdose. But that death, his conviction, and prison sentence did not deter him from dealing still more dangerous drugs (heroin) while armed with a gun. Facing a guideline range of 151–188 months, Greene received a sentence of 120 months. He now seeks to shorten that below-guideline sentence, which he began serving

1

in March 2016, by moving for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of July 13, 2020, these directives have already resulted in at least 6,854 inmates being placed on home confinement. *See* BOP Covid-19 Website.

*Second*, Greene does not qualify for compassionate release. Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Greene's failure to meet the criteria in USSG § 1B1.13 alone forecloses relief. Even when Covid-19 is taken into account, Greene's medical condition does not satisfy the

2

requirements in § 1B1.13(1)(A) & cmt. n.1. His latent tuberculosis (TB) and linear scar on his right lung are neither in the terminal phase nor do they interfere with his ability to perform basic self-care in prison. His offense and criminal history also make him a danger to the community, *see* USSG § 1B1.13(2), because they show that he is an armed drug dealer. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release.

## Background

In June 2015, law enforcement executed a search warrant at Greene's house and found 36 grams of crack cocaine, 28 grams of heroin, and a 9mm semi-automatic handgun. (R. 20: Plea Agreement, 58). In December 2015, Greene pled guilty to possession with intent to distribute cocaine base under a Rule 11 plea agreement. (R. 20: Plea Agreement). Both the Rule 11 Plea Agreement and the Presentence Report scored Greene as a career offender. (R. 20: Plea Agreement, 73, 75; PSR ¶¶ 47, 71). Although his guidelines ranged from 151–188 months (PSR ¶ 70), this Court varied downward, sentencing him to 120 months' imprisonment in March 2016. (R. 27: Judgment, 102).

Greene's federal conviction comes on the heels of a 2011 state-court conviction, for distributing cocaine to a person who died from an overdose. (PSR ¶ 44). Greene's original state charge, delivery of a controlled substance causing death, was reduced to a simple distribution charge. (*Id*.). He served two years in prison and was discharged from parole in October 2014—about eight months before committing his federal offense. (*Id*.). And Greene has three other felony drug convictions: delivery of marijuana (1,695 grams) in 2009, and two earlier possession of cocaine cases. (PSR ¶¶ 29, 35, 42). He also has a dozen misdemeanor convictions, most of which are for driving on a suspended license. (PSR ¶¶ 30-43).

Greene began serving his federal prison sentence in March 2016, and is currently incarcerated at the Federal Correctional Institution in Yazoo City, Mississippi. He is 44 years old, and his projected release date is October 4, 2024. He describes his underlying medical condition as scarring on his right lung and a latent TB infection. (R. 48: Def. Mot., 422). But in 2016 he reported that "he does not suffer from any chronic illnesses and has never been hospitalized, or had surgery." (PSR ¶ 61).

4

Nevertheless, Greene has moved for compassionate release, citing his medical condition and the Covid-19 pandemic.

## Argument

### I. The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

#### A. The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. June 9, 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 833–34. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are

5

placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](). Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 961 F.3d at 833–34. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

**B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to

7

consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 6850 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. June 2, 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might

8

have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id*. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves,"

*Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at \*6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny Greene's motion for compassionate release.

A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001).

11

Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion, which Greene has done here.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the

12

defendant's history and characteristics, the seriousness of the offense,

the need to promote respect for the law and provide just punishment for

the offense, general and specific deterrence, and the protection of the

public. 18 U.S.C. § 3553(a).

**A.    Greene has satisfied the statutory exhaustion requirement.**

 Greene has complied with § 3582(c)(1)(A)'s mandatory exhaustion

requirement. (R. 48-2: Def. Mot., 436–37).

**B.    There are no extraordinary and compelling reasons to grant Greene compassionate release.**

Compassionate release must be "consistent with applicable policy

statements issued by the Sentencing Commission." 18 U.S.C.

§ 3582(c)(1)(A). Congress tasked the Sentencing Commission with

"describe[ing] what should be considered extraordinary and compelling

reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well

developing "the criteria to be applied and a list of specific examples" for

when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's

directive in USSG § 1B1.13, that policy statement is mandatory. Section

3582(c)(1)(A)'s reliance on the Sentencing Commission's policy

statements mirrors the language governing sentence reductions under
18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare*
§ 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same
language in the same statute, it must be interpreted in the same way.
*Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing
Commission's restraints "on a district court's sentence-reduction
authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711
(6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could
move for compassionate release under § 3582(c)(1)(A). It did not amend
the substantive requirements for release. *United States v. Saldana*, No.
19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United
States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala.
Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of
defendants who are most in need. That policy statement limits
"extraordinary and compelling reasons" to four categories: (1) the
inmate's medical condition; (2) the inmate's age; (3) the inmate's family
circumstances; and (4) other reasons "[a]s determined by the Director of

14

the Bureau of Prisons," which the Bureau of Prisons has set forth in

Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth

Circuit recently explained, a district court "lack[s] jurisdiction" to grant

compassionate release when a defendant's circumstances do not fall

within those categories. *Saldana*, 2020 WL 1486892, at *3.

Greene relies on his medical condition, but he is not eligible for

compassionate release on this basis because his condition has been

successfully treated and it is not serious enough to satisfy the standard

in the first place. Greene's medical records reveal that his right lung

showed "mild bronchiectasis with linear parenchymal distortion and

scarring along the posterior aspect of the right upper lobe and

extending inferiorly into the superior segment of the right lower lobe."

(Exhibit 1). For descriptive purposes, the right lung comprises three

lobes (upper, middle, lower), sub-divided into ten segments (apical,

posterior, anterior, lateral, medial).

https://radiopaedia.org/articles/bronchopulmonary-segmental-anatomy-

1?lang=us As for Greene's right lung, his records essentially show a

linear scar in the back section of the upper lobe that extends downward

to the top portion of the lower lobe. Except for this linear scar, the vast

15

majority of his right lung is normal; all of his left lung is normal. The linear scar was suspicious for a "prior remote infectious or inflammatory process." (*Id.*).

Consistent with a prior infection, Greene's medical records also show that he likely contracted TB years ago. (Exhibit 1: Medical Records). Although a skin test returned positive for TB in 2016, he tested negative for an *active* infection. (*Id.*). Nor did Greene exhibit symptoms consistent with active TB. (*Id.*). So he received a 12-week prophylactic treatment for latent TB in 2017. (*Id.*). In short, a linear scar on one lung—from a now treated, latent condition—is not a terminal illness with an end of life trajectory. *See* USSG § 1B1.13 cmt. n.1. Nor is it a serious physical or medical condition that substantially diminishes his ability to provide self-care within the prison and from which he is not expected to recover. (*Id.*). Greene's linear scar in his right lung falls short of the threshold required for showing an extraordinary and compelling reason, even in days of COVID-19.

As for latent TB, several courts have denied compassionate release motions based on such a diagnosis. "The same is true of Defendant's latent tuberculosis (TB) infection diagnosis. According to information

16

from the CDC cited by the Government, a latent TB infection is distinct from an active TB infection in that persons with latent TB infections cannot transmit the disease and do not have any symptoms . . . it is not a certainty that a latent TB infection will progress to an active TB infection." *United States v. Hazam*, No. 18-CR-30029, 2020 WL 3265349, at *3 (C.D. Ill. June 17, 2020) (finding that prediabetes and latent TB do not constitute extraordinary and compelling reasons for compassionate release); *See, also United States v. McLin*, No. 1:17-CR-110-LG-RHW, 2020 WL 3803919, at *3 (S.D. Miss. July 7, 2020) ("The CDC does not indicate that tuberculosis (TB) increases severe risk of illness from COVID-19."); *United States v. Sattar*, No. 02-CR-395 (JGK), 2020 WL 3264163, at *3 (S.D.N.Y. June 17, 2020) ("Although tuberculosis may be a risk factor for severe illness resulting from COVID-19, Sattar has not demonstrated that his tuberculosis, which is latent, is either not controlled currently or that it could not be addressed adequately at FCI-Schuylkill.").

Because the inmate's latent TB was controlled, asymptomatic, and had been successfully treated, the district court denied the motion for compassionate release in *United States v. Rodriguez.* No. CR 17-618,

2020 WL 3447777, at *4 (E.D. Pa. June 24, 2020) (finding no evidence that his heart condition, hepatitis B, or asymptomatic, treated latent TB put him at greater risk of COVID-19). As for latent TB, the facts in *Rodriguez* align with Greene's case. Recognizing that some district courts have granted compassionate release for inmates with latent TB, the court distinguished those cases because "there were other critical circumstances that contributed to the court's decision to grant release, including the presence of another, more critical underlying condition that increased the inmate's COVID-19 risk, advanced age, and/or an upcoming release date." *Id*. at *4. For these reasons, *Rodriguez* distinguished two cases (*Atwi* and *Barrenchea*) that Greene now cites (R. 48: Def. Mot., 423–25) to support his argument. *Id*. Those same distinctions apply equally to Greene's claims. And the remaining cases Greene relies on doom his argument for similar reasons.

Start with *United States v. Miller*. No. CR 16-20222-1, 2020 WL 1814084, at *1, 4 (E.D. Mich. Apr. 9, 2020). At 69 years old, Miller had a history of coronary artery disease, chronic obstructive pulmonary disease ("COPD"), hypertension, hepatitis C, liver cancer, heart disease, and cirrhosis of the liver. *Id*. He did *not* have latent TB. In granting

18

compassionate release, the court found that his chronic obstructive pulmonary disease, serious heart condition, and liver disease put him at a higher risk of severe illness from COVID-19. *Id.* Because *Miller* involved an elderly man with a constellation of different, more serious medical conditions, it lacks relevance here.

Unable to muster relevant support for his argument, Greene resorts to citing cases that involve the issuance of temporary restraining orders in immigration actions. Neither *Doe v. Barr*, No. 20-CV-02141-LB, 2020 WL 1820667, at *1 (N.D. Cal. Apr. 12, 2020), nor *Perez v. Wolf*, No. 5:19-CV-05191-EJD, 2020 WL 1865303, at *13 (N.D. Cal. Apr. 14, 2020), analyzed whether certain medical conditions constitute extraordinary and compelling reasons under 18 U.S.C. § 3582. (R. 48: Def. Mot., 423–25). Because these cases applied different legal standards to answer different questions, they have marginal relevance.

Finally, Greene's reliance on *United States v. Johnson* is misplaced because circumstances other than his medical conditions animated the result. No. CR H-96-176, 2020 WL 3618682, at *1–3 (S.D. Tex. July 2, 2020). Most importantly, Johnson served more than 90 percent of his 370-month sentence for two firearm convictions that would not run

19

consecutively were they imposed today because of the First Step Act. *Id*.

And the court found that Johnson, now in his fifties, is no longer a

threat to the community after having served over twenty years in

prison. *Id*. at *3. In contrast, Greene has not even served half of his 120

month sentence. (R. 27: Judgment, 102; PSR ¶ 70). And the problems

with relying on *Johnson* don't end there.

Behind the conclusion that latent TB increases risk of severe illness

from COVID-19 lies the flimsiest of support. *Johnson* cites a study,

quoted in *Doe v. Barr*, that concludes that persons with latent TB *may*

be more susceptible to severe illness from COVID-19. 2020 WL

3618682, at *1–3. But there are three compounding weaknesses here.

First, unlike an experimental study where the researcher controls most

of the variables, this was only an observational study—meaning the

researcher merely observed the patients without controlling any

variables. *Doe v. Barr*, No. 20-CV-02141-LB, 2020 WL 1820667, at *5

(N.D. Cal. Apr. 12, 2020). Second, this observational study disclosed

that its findings are limited because of the small number (36) of

patients observed. *Id*. Third, the study has not been peer reviewed. *Id*.

Relying on a small, observational study that has not even been peer

reviewed is grasping at the thinnest of reeds. And the clincher here is that the CDC does not recognize latent TB as a condition that puts persons at greater risk of severe illness from Covid-19.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#copd

*Johnson* also cites *United States v. Atwi*, No. 18-20607, 2020 WL 1910152, at *5 (E.D. Mich. Apr. 20, 2020), as additional support. 2020 WL 3618682, at *2. But *Atwi* shares the same defect by relying on the same questionable study. 2020 WL 1910152, at *5. *Atwi* does have, however, a critical distinction: his latent TB had not been treated. *Id.* So the court there was concerned that "people with latent TB may develop active TB *if they do not receive treatment*." *Id.* (emphasis added). In a similar vein, *Johnson* is silent as to whether Johnson ever received treatment for latent TB. But on the other side of this coin, Greene received a 12-week course of treatment for latent TB in 2017.

So whether considered alone or in combination with the Covid-19 pandemic, Greene's medical conditions do not constitute extraordinary and compelling reasons for release under USSG § 1B1.13 cmt. n.1. *See United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5–*6 (E.D. Mich. May 15, 2020). And as his criminal history shows, he would also be unlikely to follow basic restrictions on release—much less the CDC's social-distancing protocols or a stay-at-home order. So it is hardly clear that Greene faces a greater risk now than he would if released.

Greene remains ineligible for compassionate release because he is also a danger to the community. Section 1B1.13(2) only permits release if a defendant is "not a danger to the safety of any other person or to the community." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010); *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020). An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of

22

physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and police departments, and the rise in certain types of crime during the Covid-19 pandemic. Some cities, including Detroit, have seen spikes in shootings and murders. The real risks to public safety now will only increase if our community is faced with a sudden influx of convicted defendants.

Because Greene's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). This case is Greene's third felony conviction for drug trafficking. His most recent state-court conviction involved his distribution of cocaine to a person that died from an overdose of drugs. Even that sobering fact and his subsequent prison sentence did not deter him from drug dealing within months of his discharge from parole. And by adding the opioid heroin and a firearm to his cocaine trafficking scheme, he has escalated his dangerous behavior. *See Knight*, 2020 WL 3055987, at *3. This factor, too, forecloses relief here.

### C.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See Knight*, 2020 WL 3055987, at *3 ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *Murphy*, 2020 WL 2507619, at *6 (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"). So even if the Court were to find Greene eligible for compassionate release, the § 3553(a) factors should still disqualify him.

The nature and circumstances of Greene's offense are serious— trafficking heroin and cocaine while armed. As for criminal history, he has five felony convictions and qualifies as a career offender. Having served several terms of imprisonment, he remains undeterred. Specific deterrence should be a predominant factor here because of his recidivism. Underlying all of this, his dozen misdemeanor convictions may not speak directly to dangerousness, but they do reveal an entrenched disrespect for the law. Indeed, he has two discipline

24

infractions in the last 15 months in prison. (Exhibit 2). The first

infraction involved his possession of a hazardous tool (cell phone); the

second concerned "disruptive conduct-moderate." *Id*. The Court could

have no confidence that he would faithfully follow the terms of

supervision if released now. In short, nothing about Greene's adult life

suggests that he will follow the law and refrain from endangering the

public if released here.

## III.  If the Court were to grant Greene's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Greene's motion despite the

government's arguments above, the Court should order that he be

subjected to a 14-day quarantine before release.

## Conclusion

Greene's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

Dated: July 14, 2020          s/BLAINE LONGSWORTH
Assistant United States Attorney
600 Church St., Flint, MI 48502
Phone: (810) 766-5177
blaine.longsworth@usdoj.gov
P55984

25

### *CERTIFICATION OF SERVICE*

I hereby certify that on, July 14, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will electronically serve all ECF participants.

s/Jessica Stanton
United States Attorney's Office